Plaintiffs are assigned to field locations (or other locations where they receive Meal Money in lieu of a meal period), their regular rate is derived by dividing their annual salary plus extra payments (including Meal Money) by 261 days (the number of shifts per year, as specified by the Citywide CBA at Art. IV, Sec. 6), multiplied by eight hours (and not 7 ½ hours).[43]   This calculation of the regular rate determines Plaintiffs' statutory overtime rate, and, ultimately, whether there are damages for hours over 40.

As referenced above, in O'Brien v. Town of Agawam, the Court found that where, as here, plaintiffs receive additional compensation in payment for additional time worked, that compensation *and* those hours must be included in the calculation of the regular rate.  See id., 440 F. Supp. 2d 3.  Plaintiffs in O'Brien were police officers with a nearly identical work schedule to the Conzo Plaintiffs – they worked four days on and two days off, resulting in shifting 32-hour and 40-hour workweeks.   Id. at 6.   Their CBA specified that they were compensated for 1950 hours per year, which was actually the number of straight-time hours plaintiffs worked.  See id. at 10.   In that case, the issue was not meal money but "roll call pay," which, per plaintiffs' CBA, compensated them for 10 extra minutes of roll call time per day.  See id. at 14.  Plaintiffs' daily schedule thus consisted of "eight hours of duty plus ten additional minutes for roll call."  Id.   The O'Brien plaintiffs argued that the appropriate method for calculating their regular rate was to add their salary, wage supplements, and roll call pay, and then divide that amount by 1950 hours.  See id. at 15.   The Court disagreed, holding that the proper divisor for the purposes of calculating the regular rate was 1950 hours *plus roll call time*. In other words, "[b]ecause roll call pay compensates [p]laintiffs for time spent attending roll call, roll call time must also be incorporated in the regular rate formula."  Id.

---

[43]     When Plaintiffs are assigned to work in non-field locations, in contrast, their regular rate is derived in accordance with the CBA (dividing their annual salary by 261 days multiplied by 7.5 hours).  (SUMF ¶ 379.)

In O'Brien, roll call pay compensated policemen for additional work time in much the same way that meal money compensates Plaintiffs here, and O'Brien supports Defendants' position that the calculation of the regular rate should include all time worked and all pay received in each week.

Kohlheim v. Glynn County, Ga., 915 F.2d 1473 (11th Cir. 1990) is also instructive. There, plaintiff firefighters and EMTs argued that their meal periods, during which they were *on duty*, were erroneously excluded from the hours that the county factored into the calculation of their regular rate. Id. at 1476-77. The Eleventh Circuit agreed, and held that because plaintiffs worked during their meal periods, those hours counted with respect to calculating overtime, and that *there should be no discrepancy between the number of hours compensated per work period and the number of hours actually worked.* See id. at 1480.

Moreover, as referenced above, it is entirely lawful for the regular rate to include, as it does here, different rates of pay for the same work. The regulations, as courts have recognized, do not mandate that different types of work be performed if different rates routinely are paid. See 29 C.F.R. § 778.115; Allen v. Bd. of Public Educ. for Bibb County, 495 F.3d 1306. Because Plaintiffs' compensation for meal hours is above the federal minimum wage, § 778.115 supports Defendants' position that calculation of the regular rate must account for the meal hours and Meal Money.

### (b)     Assessing Whether Unpaid Wages Are Due Under the FLSA Requires Recalculation of the Regular Rate.

As stated above, the DOL has established that where employees work in excess of 40 hours per week, all non-overtime hours and all remuneration they receive for non-overtime hours must be included in the calculation of the regular rate. See 29 C.F.R. § 778.109. The fact that the Citywide CBA provides for calculation of the regular rate based on 7 ½-hour shifts –

something other than "the total number of hours actually worked" – requires recalculation of the rate in assessing potential damages under the FLSA.  See, e.g., Adams v. Dep't of Juvenile Justice, 143 F.3d 61, 67-68 (2d Cir. 1998) (internal quotations and citations omitted).

Plaintiffs' regular rate and overtime rate of pay must be recalculated to determine whether damages exist in this case.  Per the CBA, Plaintiffs' "regular" rate excludes 2 ½ hours of work per week in the calculation of the hourly rate for overtime purposes.  "An agreement by the parties to treat certain payments differently than as compensation for hours of employment within the meaning of the Act is not determinative [under the FLSA] … The key point in calculating the regular rate of an employee's compensation for purposes of the Act is whether it is compensation for work performed during that work week."  Herman v. Anderson Floor Co., 11 F. Supp. 2d 1038, 1042 (D. Wis. 1998), citing Walling v. Harnischfeger Corp., 325 U.S. 427, 432, 65 S. Ct. 1246, 1249, 89 L. Ed. 1711 (1945); see also Walling v. Youngerman-Reynolds Hardwood Co., Inc., 325 U.S. 419, 65 S. Ct. 1242, 89 L. Ed. 1705 (1945) ("The regular rate by its very nature must reflect all payments which the parties have agreed shall be received regularly during the workweek, exclusive of overtime payments … and is unaffected by any designation of a contrary 'regular rate' in the wage contracts").

**B.**   **DEFENDANTS ARE ENTITLED TO CUMULATIVELY OFFSET ANY OVERTIME OWED TO PLAINTIFFS BY THEIR OVERPAYMENTS.**

Defendants are entitled to offset any overtime owed to Plaintiffs by the "overpayments" described above.  Premium rates for hours (1) in excess of eight in a day, 40 in a week, or the employee's "normal working hours or regular working hours," (2) on weekends or holidays, or (3) pursuant to a CBA for work outside a normal workday or workweek "shall be creditable toward overtime compensation[.]"  29 U.S.C.S. § 207(e)(5)-(7) and (h)(2); Cox v. Town of Poughkeepsie, 209 F. Supp. 2d 319 (S.D.N.Y. 2002) ("It is undeniable that certain

contractual overtime payments are creditable towards a deficiency in FLSA overtime payments").[44]  Courts that have addressed offsets for premium pay have found that they are proper under the FLSA.  For example, in O'Brien v. Town of Agawam, 350 F.3d 279 (1st Cir. 2003), the court held that where plaintiffs worked 37 ½ hours per week and earned what their CBA called "overtime" for hours beyond that, "the premium portion of the contractual overtime rate (that is, the amount in excess of the employee's regular rate) is deemed 'overtime' pay and may be offset against any statutory overtime liability in the same week." Id. at 289.

Furthermore, of critical importance to this case, courts have found that such offsets may be applied *cumulatively*, i.e., Defendants may offset the aggregate amount of overtime owed to each Plaintiff by the aggregate amount of overpayment to each Plaintiff *regardless of when the premium was paid or when the overtime was earned.*  The converse, a workweek-by-workweek offset, means that premium pay for non-overtime work may be used to offset overtime owed in that same workweek only.  Rejecting a week-by-week approach, the Fifth, Eleventh, and Federal Circuit Courts of Appeals, and District Courts in the First Circuit, have held that such offsets for premium pay should in fact be cumulative, or applied towards any overtime compensation owed, *regardless of when the premiums were earned or when the overtime was worked.*  See, e.g., Singer v. City of Waco, 324 F.3d 813 (5th Cir. 2003) (Court rejected plaintiffs' argument that cumulative offsets permitted the payment of overtime after it was due, and held that cumulative offsets merely acknowledged the fact that defendant had *already paid* the bulk of its overtime obligations); Kohlheim v. Glynn County, Ga., 915 F.2d 1473 (11th Cir. 1990) ("[C]ounty should be allowed to set-off *all* previously paid overtime

---

[44]     Section 207(e)(5) covers situations involving actual practice pursuant to a written agreement, as well as not pursuant to a written agreement. See, e.g., Hesseltine v. Goodyear Tire and Rubber Co., 39 F. Supp. 2d 509 (E.D. Tx. 2005) ("If an employer voluntarily pays an employee a premium rate contingent upon his working more than eight hours in one day, then such payment may be excluded from the employee's regular rate and credited toward unpaid overtime").

premiums ... against overtime compensation found to be due and owing during the damages phase of the trial"); <u>Alexander v. United States</u>, 32 F.3d 1571 (Fed. Cir. 1994) ("[Premium pay under § 207(h)] is creditable toward *any* overtime compensation due under the FLSA") (emphasis added); <u>O'Brien</u>, 491 F. Supp. 2d 170 (Where plaintiffs worked four days on and two days off, but received time-and-a-half whenever they worked beyond their scheduled shift regardless of regular hours worked, defendants were entitled to cumulative offsets); <u>Murphy v. Town of Natick</u>, 516 F. Supp. 2d 153 (D. Mass. 2007) (Where Natick officers were paid contractual overtime for weeks in which they worked in excess of their scheduled hours, but less than 40 hours, Town was entitled to offset plaintiffs' damages on a cumulative basis); <u>Hesseltine</u>, 391 F. Supp. 2d 509.[45]

The propriety of cumulative offsets appears to be one of first impression in the Second Circuit. Defendants urge the Court to adopt the well-reasoned opinions of the Fifth, Eleventh, and Federal Circuits and offset any overtime owed to Plaintiffs by Defendants' payment of premium pay on a cumulative basis.

### 1. Application of Cumulative Offsets in This Case is Warranted in the Absence of Evidence That Defendants Willfully Violated the FLSA, and Because Plaintiffs Will Receive a Windfall if Cumulative Offsets Are Not Applied.

Offsetting overtime allegedly owed on a cumulative basis is warranted from both a fairness standpoint – since Defendants have, in effect, already paid Plaintiffs – and because there is no evidence that Defendants' alleged FLSA violations were willful. In <u>Howard v. City of Springfield</u>, 274 F.3d 1141 (7th Cir. 2001), the dissent, disagreeing with the Court's application of weekly instead of cumulative offsets, pointed out that while there was no

---

[45]     In contrast, Courts of Appeals the Fourth, Sixth, and Seventh Circuits, and District Courts in the Eighth Circuit, have held that offsets may only be applied to workweeks in which the premium pay was earned. <u>See</u>, <u>e.g.</u> <u>Roland Electrical Co. v. Black</u>, 163 F.2d 417 (4th Cir. 1947); <u>Herman v. Fabri-Centers of America</u>, 308 F.3d 580 (6th Cir. 2002); <u>Howard v. City of Springfield</u>, 274 F.3d 1141, 1147-49 (7th Cir. 2001); <u>Nolan v. City of Chicago</u>, 125 F. Supp. 2d 324 (N.D. Ill. 2000); <u>Bell v. Iowa Turkey Growers Coop.</u>, 407 F. Supp. 2d 1051 (S.D. Ia. 2006).

Congressional intent to penalize employers by assessing damages beyond those set forth in § 216(b) of the FLSA (the logical result of week-by-week offsets), § 207(h) did evince a clear Congressional intent to allow the offsetting of overtime owed by premium pay, and noted that the disallowance of cumulative offsets resulted in a windfall to plaintiffs. See id. at 1150. The Howard dissent stated that cumulative offsets were particularly warranted where there was no evidence that defendant City acted willfully. See id. The O'Brien court, in finding that cumulative offsets were proper, echoed the Howard Court's dissent: "[f]orcing an employer, who has given a premium rate of pay for overtime, to forego the receipt of credit and to pay additional overtime punishes the employer without regard to whether it was attempting to avoid its obligation to adequately compensate employees for extra hours worked." O'Brien, 491 F. Supp. 2d at 176, quoting Howard, 274 F.3d at 1150.

In this case, it is without question that in 1986, following the Supreme Court's application of the FLSA to state and local governments in Garcia v. San Antonio Metropolitan Trans. Auth., 469 U.S. 528, 105 S. Ct. 1005 (1985), the City initiated the process of complying with the FLSA, and has continued to endeavor to comply with the statute ever since (SUMF ¶ 380):

- On March 7, 1985, Robert Linn, Director of the Office of Municipal Labor Relations, issued a memo to Stanley Brezenoff, First Deputy Mayor, regarding the FLSA's purview, its exemptions, and its likely effect on overtime worked by non-exempt employees; the memo also set forth proposals for addressing the FLSA, including the establishment of task forces to study its likely impact on the City (SUMF ¶ 381);

- In an April 23, 1985 memorandum from Frances Milberg, Deputy Director and General Counsel of the Office of Municipal Labor Relations, the City solicited recommendations with respect to bringing its collective bargaining agreements into compliance with the FLSA (SUMF ¶ 382);

- In a March 17, 1986 Administrative Order issued to all City agency heads, entitled "Compliance with Federal Overtime Laws," Stanley Brezenoff, then-First Deputy Mayor, set forth, inter alia, the following: the establishment of an FLSA

Coordinator responsible for FLSA compliance at each agency; the cessation of voluntary and involuntary overtime absent specific overtime directive; the recalculation of the regular rate to include all types of premium pay, per the FLSA; the classification of exempt and non-exempt employees; and, the parameters of hours worked (SUMF ¶ 383);

- The Citywide CBA contains an FLSA dispute resolution procedure, which acts as a vehicle for the early identification of FLSA-related issues and provides a method for quickly addressing those issues.  (SUMF ¶ 384.)  The dispute resolution procedure contained in the Citywide CBA first appeared in its present form in the 1990-1992 Citywide CBA.  (SUMF ¶ 385.)

The City's response to the FLSA at the highest levels of its government, and its continuing commitment to FLSA compliance, demonstrates that any violation of the Act is not willful.

Moreover, the reasoning set forth in the cases holding that only week-by-week offsets were appropriate is unsound, and should not be relied upon in the instant case.  In both Herman, 308 F.3d 580, and Howard, 274 F.3d 1141, the courts held that cumulative offsets were improper only because the FLSA generally stands for "the primacy of the workweek concept." Herman, 308 F.3d at 589; see also Howard, 274 F.3d at 1148.  Yet the Herman court acknowledged the statute's silence with respect to the issue of cumulative vs. workweek-by-workweek offsets, as well as the silence in its implementing regulations.  See Herman, 308 F.3d at 590.  Those courts – as well as the courts in Nolan and Bell, which relied on Herman – reached the conclusion that cumulative offsets "advocate[] a method of payment that would allow [defendant] to pay its overtime obligations at a time far removed from when that overtime amount was due." Howard, 274 F.3d 1148.  See also Nolan, 125 F. Supp. 2d at 331-33; Bell, 407 F. Supp. 2d at 1063.  Other courts, however, have recognized the flawed nature of such reasoning.

A more compelling approach was followed in Singer, where firefighters suffered minimal underpayments in 120-hour pay periods but received considerable overpayments in 96-hour pay periods, the Court held that cumulative offsets were proper.  In response to the claim

66

that the District Court had condoned the late payment of overtime by allowing cumulative offsets, the Court of Appeals opined:

> The district court did not permit the City to pay its overtime obligations years after they were due. Instead, the court simply acknowledged that the City *already paid* the bulk of its overtime obligations. When the City overpaid its employees in the 96-hour periods, it essentially compensated the employees for the shortfalls in the 120-hour periods ... we need not view the overpayments made by the City during the 96-hour work periods as "late" payments of overtime compensation. It seems more appropriate to view those overpayments as *pre*-payments: the City pre-paid the fire fighters to compensate them for the shortfalls they would receive in subsequent 120-hour work periods.

Id., 324 F.3d at 828 (emphasis in original). In this case, as in Singer, overpayments could be viewed as compensating Plaintiffs for subsequent weeks in which they are allegedly owed damages.

Further, the FLSA's overriding purpose – "to protect workers from the twin evils of excessive work hours and substandard wages" – are served by the application of cumulative offsets in cases where, like here, employers have chosen to provide employees with a non-statutory benefit. In Hesseltine, 391 F. Supp. 2d 509, the company paid its employees an overtime rate of 1.71 times their regular rate instead of 1.5 times their regular rate, and further, paid employees overtime starting at 24 hours worked in one week and 32 hours worked in the next. See id. at 523. The court found that cumulative offsets were appropriate because "Goodyear paid Plaintiffs a premium pay rate when it was not required to do so." Id. Moreover, in Kohlheim, although the court specifically noted that "care must be taken to ensure that ... employees are fully compensated for their time on the job," it also found that cumulative offsets for defendants' payment of a higher overtime rate than that required by the FLSA were warranted.

2. **The Application of Cumulative Offsets Has the Effect of Virtually Eliminating Plaintiffs' Alleged Damages.**

Even assuming that Plaintiffs establish their claims for heat days, the inclusion of night shift differential in the regular rate, late overtime, and 2 ½ hours of straight time for weeks in which they worked more than 40 hours, Defendants' overpayments are so prodigious that Plaintiffs' damages are virtually eliminated:[46]

| Plaintiffs' Claims | Number of Test Plaintiffs With Damages After Application of Cumulative Offset | Amount of Test Plaintiffs' Damages After Application of Cumulative Offset | Amount by Which Test Plaintiffs Have Been Overpaid After Application of Cumulative Offset |
|---|---|---|---|
| Heat days + exclusion of night shift differential from regular rate (SUMF ¶ 390.) | 0 | $0 | $1,721,850.00 |
| Heat days + exclusion of night shift differential from regular rate + late overtime (SUMF ¶ 391.) | 1 | $57.00 | $1,680,284.00 |
| Heat days + exclusion of night shift differential from regular rate + late overtime + 2 ½ hours of straight time in over-40-hour workweeks (SUMF ¶ 392.) | 4 | $1,299.00 | $1,358,003.00 |

As set forth above, assuming *arguendo* that Plaintiffs prevail on their claims that Defendants failed to pay them for heat days[47] and excluded night shift differential from the calculation of the regular rate, *no* Test Plaintiffs are owed unpaid wages once their damages are offset by Defendants' overpayments for any work beyond Plaintiffs' regular shifts and for any overtime. Moreover, assuming that Plaintiffs prevail on their heat days, night shift differential, *and* late overtime claims, only *one* Test Plaintiff is owed unpaid wages, totaling $57.00; if Plaintiffs'

---

[46]      This analysis covers the period from January 1, 2002 through August 6, 2006. (SUMF ¶ 394.) The Parties agreed to this representative period for the purposes of potential damages calculations. (SUMF ¶ 395.)

[47]      As referenced earlier, heat days are days, pursuant to a bargained-for Stipulation with Plaintiffs' union, which the FDNY used to require EMTs and Paramedics hired in or after 1993 to work without pay. (SUMF ¶ 386.) Such Plaintiffs used to be required to work two heat days per year for their first three years of employment. (SUMF ¶ 387.) The FDNY ceased its heat days practice in April 2006. (SUMF ¶ 388.)

claim for 2 ½ hours of straight time in over-40-hour workweeks is added to the calculation, only *four* Test Plaintiffs have any damages, totaling $1,299.00.[48]

**POINT VI**

**IN THE ALTERNATIVE, THIS COLLECTIVE ACTION SHOULD BE DECERTIFIED, BECAUSE PLAINTIFFS ARE NOT SIMILARLY SITUATED PURSUANT TO 29 U.S.C. §216(b).**

**A.    LEGAL STANDARD.**

Plaintiffs bring their claims as a collective action pursuant to 29 U.S.C. § 216(b) of the FLSA, which provides:

> An action to recover … liability … may be maintained against any employer … by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.  No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

Approval of a collective action under the FLSA involves a two-step process.  See, e.g., Gjurovich v. Emmanuel's Marketplace, Inc., 282 F. Supp. 2d 91, 96 (S.D.N.Y. 2003); Masson v. Ecolab, Inc., 04 Civ. 4488 (MBM), 2005 U.S. Dist. LEXIS 18022 (S.D.N.Y. Aug. 17, 2005); Dumitrescu v. Mr. Chow Enterprises, Ltd., No. 07 Civ. 3601 (PKL), 2008 U.S. Dist. LEXIS

---

[48]    Further, the alleged unpaid wages of Plaintiffs assigned to EMD are completely eliminated when offset against their paid breaks. (SUMF ¶ 400.) All Plaintiffs assigned to EMD receive three 40-minute breaks, or two 20-minute breaks and two 40-minute breaks, per day, and are completely relieved from all duties during these periods of time. (SUMF ¶¶ 396-98.) It is well-established that bona fide meal periods are not worktime. See 29 C.F.R. § 785.19(a). The meal period is bona fide when the employee is completely relieved from duty during those periods, although it is not necessary that he or she be permitted to leave the premises. See id. Courts have found that where breaks are not considered compensable time, the employer is permitted to offset any amounts paid for the break time against any amounts owed to plaintiffs for unpaid overtime. See Avery v. City of Talladega, 24 F.3d 1337 (11th Cir. 1994) ("If the meal break is not compensable time under the FLSA, then the City should be allowed to offset the amount it pays for the meal break against any amount it owes the plaintiffs for pre- and post-shift time at work"), citing Cloutier v. City of Phenix City, 834 F. Supp. 366 (M.D. Ala. 1993).  Generally, break time is compensable only where the worker "performs activities predominantly for the benefit of the employer." Reich v. Southern New England Telecomm. Corp., 121 F.3d 58 (2d Cir. 1997).  Courts have held that where employees are free to spend their breaks in any way they wish, such time is not considered compensable. See Avery, 24 F.3d at 1347 (Breaks not compensable where plaintiff patrol officers were "free to spend their meal breaks in any way they wish so long as they remain in uniform, leave their radios on, and do not leave the jurisdiction"); see also Lamon v. Shawnee, 972 F.2d 1145 (10th Cir. 1992) (Breaks not compensable if "a police officer's time and attention are primarily occupied by a private pursuit, presumably the procurement and consumption of food").

49881 (S.D.N.Y. June 30, 2008).   At the first step, the court examines the pleadings and affidavits to determine whether the proposed class plaintiffs are "similarly situated," per the language of § 216(b).  See Dumitrescu, 2008 U.S. Dist. LEXIS at *8.  If the class is conditionally certified, at the second step, the court carefully examines whether the class plaintiffs are similarly situated based on the record produced.  See Masson, 2005 U.S. Dist. LEXIS at *40.  In the context of this second analysis, plaintiffs are held to a higher standard with respect to establishing that they are similarly situated.  See Ayers v. SGS Control Services, Inc., 2007 U.S. Dist. LEXIS at *16, citing Torres v. Gristede's Operating Corp., No. 04 Civ. 3316 (PAC), 2006 U.S. Dist. LEXIS 74039 (S.D.N.Y. Sept. 28, 2006).  At the second stage, three factors are examined: "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to [the] defendant which appear to be individual to each plaintiffs; and (3) fairness and procedural considerations."  Ayers, 2007 U.S. Dist. LEXIS at *20, citing Torres, 2006 U.S. Dist. LEXIS at *9; see also Moss v. Crawford & Co., 201 F.R.D. 398 (W.D. Pa. 2000), citing Thiessen v. General Electric Captial Corp., 996 F. Supp. 1071, 1080 (D. Kan. 1998); Rodolico v. Unisys Corp., 199 F.R.D. 468, 482 (E.D.N.Y. 2001), citing Lusardi v. Xerox Corp., 118 F.R.D. 351 (D.N.J. 1987).

   As referenced above, the proceedings in this case do not mirror the traditional two-stage process described above.  Plaintiffs circumvented the initial certification stage by naming all Plaintiffs on the caption and filing approximately 1,473 opt-in forms following the commencement of suit.  (SUMF ¶ 401.)  As a result, the Court was denied the opportunity to determine which Plaintiffs are similarly situated and share bona fide claims, and thus whether this action should proceed as an FLSA collective action as to all, some, or none of Plaintiffs.  Since discovery in this case nearly is completed, the Court can conclude that Plaintiffs are not

similarly situated through the lens of the "stage two" decertification analysis. See Harris v. Fee Transp. Servs., Inc., No. 3:05-CV-0077-P, 2006 U.S. Dist. LEXIS 51437 (N.D. Tex. May 15, 2006) (Application of second-stage analysis appropriate where parties have had the opportunity to conduct discovery); Valcho v. Dallas County Hosp. Dist., No. 3:07-CV-1853-D, 2008 U.S. Dist. LEXIS 63862 (N.D. Tex. Aug. 19, 2008) (Second-stage analysis appropriate because courts "will hesitate to facilitate notice where a plaintiff, having already conducted discovery, still cannot support her claim with evidence").

**B.   PLAINTIFFS' FACTUAL AND EMPLOYMENT SETTINGS ARE SO DISPARATE AS TO PRECLUDE A FINDING THAT THEY ARE SIMILARLY SITUATED.**

**1.   Plaintiffs Must Demonstrate That Their Factual Circumstances Are Similar and That They Were Subject to a Single Decision, Policy, or Plan.**

In considering Plaintiffs' factual and employment settings for the purpose of analyzing whether they are similarly situated under 29 U.S.C. § 216(b), courts examine "job duties, geographic location, supervision and salary." Moss, 201 F.R.D. at 409. In the context of this prong of the "similarly-situated" test, courts look to whether plaintiffs "were all impacted by a single decision, policy, or plan. The existence of this commonality may assuage concerns about plaintiffs' otherwise varied circumstances." Ayers, 2007 U.S. Dist. LEXIS at *19-20, quoting Moss, 201 F.R.D. at 410 (internal quotations omitted). In the case at hand, these factors mandate a finding that Plaintiffs were not similarly situated.

For example, since Plaintiffs work in a multitude of locations and were supervised by different decision makers, they are not similarly situated to each other. See, e.g., Basco v. Wal-Mart Stores, Inc., No. 00-3184, 2004 U.S. Dist. LEXIS 12441 (E.D. La. July 1, 2004) (Motion to certify class denied where plaintiffs "performed different jobs at different geographic locations and were subject to different managerial requirements which occurred at various times

as a result of various decisions by different supervisors made on a decentralized employee-by-employee basis"). Lawrence v. The City of Philadelphia, No. 03-CV-4009, 2004 U.S. Dist. LEXIS 8445 (E.D. Pa. April 28, 2004), bears striking similarity to the case at bar and militates against proceeding as a collective action. In Lawrence, the Court granted the City's motion for misjoinder as to off-the-clock work even though the plaintiffs, who were Fire Service Paramedics, shared the same job title and general job description. See id., 2004 U.S. Dist. LEXIS at *7. The Lawrence Court found that the fact that the plaintiffs (like the Plaintiffs herein) "work in different unit types, different platoons, different locations, and have different supervisors" meant that the factual circumstances of their claims would vary too widely to be resolved by the mechanism of a collective action. Id. With respect to plaintiffs' off-the-clock work claim in particular, the Lawrence Court found the claim was not amenable to collective action treatment because it

> does not involve regularly scheduled time that is worked by all Plaintiffs of the class. Rather, each of the Plaintiffs may potentially claim that on any given day he or she arrived early or departed outside of their regularly scheduled hours and were not compensated for such. The circumstances of those individual claims potentially vary too widely to conclude that … Plaintiffs are similarly situated.

Id. at *2.

Similarly, in Diaz v. Electronics Boutique, No. 04-CV-0840E(Sr), 2005 U.S. Dist. LEXIS 30382 (W.D.N.Y. Oct. 17, 2005), the Court held that plaintiffs had not established that they were similarly situated because their job responsibilities differed; they worked at different locations; and their claims for off-the-clock work were "too individualized to warrant collective action treatment." See id. at *11-19. In Diaz, the attempt to demonstrate that plaintiffs in three job classifications were similarly situated was rejected because "their responsibilities, in fact, may differ and thus a highly fact-specific and detailed analysis of each [individual's] duties is required, making class treatment inappropriate." Id. at *14. Further, the Court found that the

off-the-clock claims were not appropriate for adjudication as a collective action because they "require[d] an examination of when [plaintiff] was scheduled to work, when he actually worked, whether he was paid for such and whether [his supervisor] altered his timesheets[.]" Id. at *17.

Further, courts have cautioned that where the factual circumstances underlying plaintiffs' claims are disparate, "while plaintiffs' claim that they were illegally denied overtime pay is ostensibly a common legal nexus giving rise to a common injury, that commonality is illusory[.]" Smith v. T-Mobile USA, Inc., No. CV 05-5274 ABC (SSx), 2007 U.S. Dist. LEXIS 60729, *15 (C.D. Cal. August 15, 2007). Thus, as here, where plaintiffs with the same title and job description perform different day-to-day job duties, they are not similarly situated with respect to section 216(b). See King v. West Corp., No. 8:04CV318, 2006 U.S. Dist. LEXIS 3926, *43-44 (N.D. Ne. January 13, 2006).

Reed v. Mobile County School System, 246 F. Supp. 2d 1227, 1232 (S.D. Ala. 2003), is also instructive. A factor which contributed to the Court's decision not to certify a proposed FLSA collective action was the number and location of decision-makers involved in the employer's highly discretionary and individualized overtime practices. The number of decision-makers, the location of those decision-makers, the amount of discretion vested in those decision-makers, and plaintiffs' failure to demonstrate controlling patterns or practices were fatal to a class. In so finding, the Court held that

> Absent some showing that principals, supervisors and others involved in decisions involving overtime compensation operate in lockstep, the denial of overtime compensation by one decisionmaker does not readily suggest similar denials by other decisionmakers, even those operating at the same location.

Id. at 1233. Moreover, courts have found that where "evidence showed 'a substantial variance of experiences by different Plaintiffs under different managers [in different work locations],'" decertification is proper. Proctor v. Allsups Convenience Stores, Inc., No. 2:06-CV-255-J, 2008

U.S. Dist. LEXIS 33707 (N.D. Tex. April 24, 2008) (Decertification granted where some plaintiffs testified that they did work off-the-clock, while 10 percent testified that they did not, some plaintiffs testified that they spent a large portion of time off-the-clock, while others alleged a minimal amount of time, and plaintiffs' claims overall varied from store to store and manager to manager), quoting Johnson v. TGF Precision Haircutters, Inc., No. H-03-3641, 2005 U.S. Dist. LEXIS 44259 (S.D. Tex. Aug. 17, 2005) (Decertification granted where plaintiffs at some stores stated that they were not allowed to clock in when they worked for 15 minutes before the store opened, while other employees stated that they did clock in for that time, and all employees gave varied testimony regarding clock-out procedures); see also Smith, 2007 U.S. Dist. LEXIS at *14 (Finding that class was not similarly situated where plaintiffs' common allegation that they were required to work off-the-clock arose out of a myriad of different fact patterns, with different degrees of involvement by plaintiffs' managers).

Furthermore, with respect to whether Plaintiffs were subject to a single decision, policy, or plan, federal courts have held that when the plaintiffs cannot prove that they "were victims of a common policy or plan that violated the law," their lawsuit cannot proceed as a collective action. See, e.g., Realite v. Ark Restaurants Corp., 7 F. Supp. 2d 303, 306 (S.D.N.Y. 1998); see also Barfield v. New York City Health and Hospitals Corp., No. 05 Civ. 6319 (JSR), 2005 U.S. Dist. LEXIS 28884 (S.D.N.Y. Nov. 19, 2005), aff'd, 537 F.3d 132 (2d Cir. Aug. 8, 2008) (FLSA collective action not certified where the plaintiff could not present evidence of a widespread policy or practice). Where plaintiffs can only show "sporadic violations arising out of individual circumstances, rather than violations stemming from a common impetus," a finding that plaintiffs are similarly situated is not warranted. Smith, 2007 U.S. Dist. LEXIS at *17; see also Diaz, 2005 U.S. Dist. LEXIS 30382 (Plaintiffs could not bring a collective action under the

FLSA because they could not demonstrate a common policy that violated the law); Mielke v. Laidlaw Transit, Inc., 313 F. Supp. 2d 759, 763 (N.D. Ill. 2004) (Court rejected proceeding as a collective action because defendant's "fail[ure] to pay overtime was not based upon a single, uniform policy or decision"). Moreover, where plaintiffs present no evidence of a widespread, established policy, and evidence demonstrates that violations "occurred on a decentralized level by local management, rather than through centralized authority," certification is not proper. Ray v. Motel 6, No. 3-95-828, 1996 U.S. Dist. LEXIS 22565, *11 (D. Minn. Feb. 15, 1996) (Decertification granted where "official written policy dictates that overtime will be paid in compliance with the FLSA," and "if an illegal scheme exists at all, it is implemented on a decentralized level" because "approval of overtime is controlled by area supervisors").

   2.   **The Facts Surrounding Each Plaintiff's Employment With the FDNY Are Highly Individualized.**

   It is beyond question that the class of Plaintiffs is comprised of employees who hold different titles, have different responsibilities, and work in different places. (SUMF ¶ 6.) Plaintiffs work in approximately 31 field locations and many non-field locations.[49] (SUMF ¶¶ 11, 48.) Decisions made at each of those different locations are subject to the discretion of different supervisors with respect to timekeeping and the earning of overtime. (SUMF ¶¶ 315-16, 336-38, 342-43.) The facts with respect to Plaintiffs' multiplicity of titles, work locations, job duties, shift assignments, timekeeping procedures, and supervisors, together with Plaintiffs' own testimony, soundly defeat any claim that Plaintiffs are similarly situated:

   (1)   Plaintiffs assigned to the field have very different claims than those assigned to non-field locations. The difference in testimony between Plaintiffs assigned to the field and Plaintiffs assigned to non-field locations is stark; field Plaintiffs testified to performing

---

[49]   As of November 2005, at least 300 Plaintiffs in this action were permanently or temporarily assigned to non-field assignments. (SUMF ¶ 44.) This figure represents over 20 percent of Plaintiffs. (SUMF ¶ 45.)

far more off-the-clock work than those assigned to non-field locations.[50] For example, Plaintiffs assigned to EMD testified, generally, that prior to the start of their shift, they simply engaged in a brief conversation with the Plaintiff whom they were relieving, or occasionally relieved the outgoing Dispatcher early.  (See Point II.B.2.h, *supra*.)  In contrast, some Plaintiffs assigned to the field testified to diverse pre-shift tasks – although not all field Plaintiffs testified to performing the same pre-shift tasks – including but not limited to paperwork, ACR/ePCR correction, narcotics audits, discussions with supervisors, ePCR scanning, cleaning, and moving ambulances.  (See Point II.B.2.a through g, *supra*.)  Further, Plaintiffs' work schedules at non-field locations differ greatly from those at field locations; for example, those assigned to EMD receive two hours of compensated, duty-free breaks per day, while those assigned to the field do not.  (See fn. 48, *supra*.)

Indeed, Plaintiffs have acknowledged the lack of opportunity for pre- and post-shift work with respect to Plaintiffs employed at 52 non-field locations.  On July 16, 2008, the Parties filed a stipulation with the Court stating that Plaintiffs assigned to 52 non-field locations do not have a claim for pre-shift or post-shift off-the-clock work in this lawsuit.  (SUMF ¶ 402.)  Although Plaintiffs have not stipulated as to the lack of such claims with respect to the multitude of Plaintiffs employed at non-field locations like EMD, Bureau of Training ("BOT"), and Resource Coordination Center ("RCC"), the testimony of those non-field Plaintiffs whom Defendants deposed reveals that their off-the-clock claims are far fewer than those of field Plaintiffs.

---

[50]     Such evidence is based on the depositions of 20 Test Plaintiffs.  As referenced above, Defendants sought the production of, and properly noticed, additional Plaintiffs for depositions, and pursuant to the Parties' Joint Stipulation and Order Regarding Test Plaintiffs, were permitted to take up to 80 Plaintiff depositions.  However, Plaintiffs refused to appear for any additional depositions.  Defendants submit that if Plaintiffs had not obfuscated the discovery process in this case, and had abided by the Parties' prior stipulations, an even broader gulf between the claims of field Plaintiffs and non-field Plaintiffs would have been exposed.

Moreover, with respect to Plaintiffs' claim for donning and doffing their uniforms, a higher percentage of non-field Plaintiffs testified, generally, that they wore their uniform into and home from work.[51]  (SUMF ¶ 403.)  In contrast, most Plaintiffs assigned to the field testified that they did not.  (SUMF ¶ 404.)

(2)     <u>Plaintiffs assigned to certain non-field locations have different claims than those assigned to other non-field locations</u>.  Furthermore, even within the sub-group of Plaintiffs assigned to work at non-field locations, those Plaintiffs' claims for off-the-clock work are very different.  As referenced above, the off-the-clock claims of Plaintiffs assigned to EMD, a non-field location, tended to be minimal.  (<u>See</u> Point II.B.2.h, *supra*.)  The only individual Defendants deposed from Personnel testified that she had <u>no</u> claims for pre- or post-shift work when assigned to that location.  (SUMF ¶ 405.)  Moreover, the only individual Defendants deposed who was assigned to Intergovernmental Affairs testified that she had <u>no</u> claims for pre- or post-shift work when assigned to that location.  (SUMF ¶ 406.)  In contrast, Defendants deposed one plaintiff from RCC (a non-field location), who testified that he spent 15 minutes to half an hour before the start of his shift allegedly engaged in briefings with the outgoing Plaintiff; he also claimed that after the end of his shift, he spent as much as 15 minutes giving a similar briefing to the oncoming Plaintiff.  (SUMF ¶ 407.)  Further, Plaintiffs assigned to BOT, also a non-field location, testified that before the start of the shift, they check equipment used during classes, and prepare their classrooms, for 15 minutes to half an hour on each day that they teach.  (SUMF ¶ 408.)  Just one Plaintiff assigned to BOT testified to staying 15 minutes past the end of her shift each day that she taught a class to answer students' questions, and was not compensated for that time.  (SUMF ¶ 409.)  Accordingly, even among non-field Plaintiffs, their

---

[51]     Of the approximately six non-field individuals Plaintiffs permitted Defendants to depose, four of them – Evelyn Ford, Edna Pringle, Thomas McCoy, and Patricia Slavik – testified that they wore all, or almost all, of their uniform into work.  (SUMF ¶ 403.)

claims for overtime associated with off-the-clock work vary widely depending on their particular assignment.

(3)    Field Paramedics have different claims for off-the-clock work than field EMTs.  Paramedics assigned to the field testified to having more claims for pre- and post-shift work than EMTs.  For example, to the extent Plaintiffs performed Part 800 vehicle checks prior to the start of their shifts, Paramedics distinguished the time required to complete the vehicle check as Paramedics than as EMTs.[52]   (SUMF ¶¶ 410-11.)   Further, Paramedics testified to spending uncompensated pre- or post-shift time performing audits of the narcotics restock locker in the Lieutenants' office, which EMTs did not testify to, because they are not qualified to handle controlled substances.   (See Point II.B.2.c, *supra*.)   Clearly, the difference in duties between Paramedics and EMTs affects each Plaintiff's ability to work non-scheduled overtime and the extent to which he or she possesses a claim for off-the-clock work.

(4)    Certain field Plaintiffs assigned to work Tour 2 have different claims for pre-shift work than other field Plaintiffs.  In addition to the significant difference in duties between EMTs and Paramedics, Plaintiffs assigned to Tour 2 may have a greater possible opportunity to work pre-shift, as compared with those on Tours 1 and 3, because the FDNY runs fewer ambulances on Tour 1 than on Tours 2 and 3.   (SUMF ¶¶ 412-14.)   Thus, a Tour 2 Plaintiff's vehicle may not be scheduled to run on Tour 1, and he or she may have the opportunity to check that vehicle pre-shift if he or she wanted to (but would not be required to do so).[53]   In contrast, if a Plaintiff's vehicle is assigned to the previous tour, that unit does not return to the station until shortly before the beginning of the next tour, unless it is on a late call, in

---

[52]    Plaintiff Anthony Almojera testified that as a Paramedic, his vehicle check took him 30 minutes, but that as an EMT, it only took 10 minutes.  (SUMF ¶ 410.)  Plaintiff Yvette Montalvo also testified that her vehicle check took her 20 to 25 minutes as a Paramedic, but only 10 to 15 minutes as an EMT.  (SUMF ¶ 411.)

[53]    Because Tours 2 and 3 generally run the same number of ambulances, only a Tour 2 Plaintiff may be assigned to a vehicle not scheduled to run on the previous tour.  (SUMF ¶¶ 413-14.)

which case it may not return prior to the next shift at all. (SUMF ¶¶ 287-90, 415.) Plaintiffs also testified that when their assigned ambulances ran on the previous tour, their opportunity to engage in pre-shift work on the ambulance was less frequent. (SUMF ¶¶ 290, 416.)

(5)   <u>Plaintiffs were subject to the discretion of their supervisors with respect to the recording and earning of overtime.</u>  Plaintiffs' supervisors review timesheets and endorse reported overtime. (SUMF ¶ 315.)  More specifically, Lieutenants use their discretion to decide whether to round Plaintiffs' overtime. (SUMF ¶ 316.)  According to Plaintiffs themselves, the circumstances under which they received overtime, and how much overtime they received, varied according to their supervisor.  Some Plaintiffs testified that they received at least 15 minutes of overtime whenever they worked <u>any time</u> beyond their regular shift. (SUMF ¶ 417.) Other Plaintiffs testified that they failed to earn any overtime unless they worked at least 15 minutes past their regular shift.  (SUMF ¶ 418.)  Still other Plaintiffs testified that their supervisors rounded their overtime according to whether they had worked past the 7 ½-minute mark of the 15-minute increment. (SUMF ¶ 317.)

(6)   <u>Whether Plaintiffs have a claim for night shift differential depends on their work location and tour assignment.</u>  Plaintiffs in the field, and to certain non-field locations which operate on a 24-hour basis, are assigned to one of three shifts: the night shift (Tour 1), the day shift (Tour 2), and the evening shift (Tour 3).  (SUMF ¶¶ 18, 47.)  Generally, only Plaintiffs assigned to the night shift or evening shift (Tours 1 and 3) are eligible to receive night shift differential (SUMF ¶ 419); accordingly, only those individuals may have a claim that their night shift differential was improperly excluded from the calculation of their regular rate for overtime purposes.  Moreover, the majority of non-field locations do not operate on a 24-hour basis. (SUMF ¶ 46.)  Plaintiffs assigned to those locations typically work Tour 2, or the day shift, and

do not receive night shift differential. (SUMF ¶¶ 46, 420.) Therefore, no Plaintiffs assigned to such locations would have a claim regarding night shift differential. It is uncontroverted that not all Test Plaintiffs were regularly paid night shift differential. (SUMF ¶ 421.)

(7)   Whether Plaintiffs have a claim for heat days depends on such dissimilar facts as when they began employment and when they worked their heat days. The FDNY's heat days practice ceased in April 2006. (SUMF ¶ 388.) For that period of time, only 50 Test Plaintiffs worked any heat days, and arguably have a claim for such damages.[54] (SUMF ¶ 422.) It is beyond question that the FDNY did not maintain any policy *requiring* Plaintiffs to work heat days on specific days (and not on others); rather, it was up to the discretion of each Plaintiff, or individual station Captains and Lieutenants, to schedule Plaintiffs' heat days. (SUMF ¶ 424.)

Heat day work does not automatically violate Section 206 of the FLSA. Under the FLSA, as long as an employee receives at least minimum wage for all hours worked under 40, he or she has been appropriately compensated. See 29 C.F.R. § 778.101. Thus, if a Plaintiff worked a heat day during a week in which he or she did not work more than 40 hours, he or she would be compensated well above the FLSA minimum wage. (SUMF ¶ 425.) It is without question that during the time period January 1, 2002 to April 31, 2006, Plaintiffs worked heat days in weeks when they worked 40 or fewer regular hours approximately 49 percent of the time. (SUMF ¶ 426.)

(8)   Whether Plaintiffs have a claim for late overtime depends on the particular circumstances of each late payment. Without question, the issuance of late overtime payments was a rare occurrence for Plaintiffs: less than one percent of the overtime paid to Plaintiffs was paid late. (SUMF ¶ 352.) Determination of whether Defendants are liable with respect to the

---

[54]   When cumulative offsets are applied for Defendants' overpayments for hours beyond Plaintiffs' regularly-scheduled shifts and for overtime, <u>no</u> Test Plaintiffs, have any damages associated with heat days. (SUMF ¶ 423.)

late overtime payments that were made involves an examination of the reason for the late payment.    Plaintiffs themselves have testified that late payments occurred because they personally failed to submit timely documentation of overtime.   (See Point IV.B, *supra*.) Plaintiffs also testified that late payments occurred due to such diverse reasons as errors by supervisors or by the Office of Payroll Administration.   (See Point IV.B, *supra*.)   Further, although Defendants generally paid Plaintiffs properly on the next regular payday following Plaintiffs' complaint, an analysis of Defendants' liability would involve tracking the period of time between Plaintiffs' submission of a Payroll Inquiry form and Defendants' payment in *each* instance.  (SUMF ¶ 364-67.)

### 3.  Plaintiffs Cannot Demonstrate That They Were Subject to a Single Decision, Policy, or Plan.

As detailed above, Plaintiffs will not be able to produce any evidence that their claims for overtime are based upon a "common practice or scheme."  Torres, 2006 U.S. Dist. LEXIS at *33 (internal citations omitted).   It is undisputed that the FDNY's policy is that Plaintiffs must record and maintain accurate time records.   (SUMF ¶ 332.)  Moreover, to the extent that Plaintiffs commence work prior to their regularly-scheduled tour of duty, or continue to work after their tour has finished, it is FDNY policy that Plaintiffs must record *all* time worked beyond a regularly-scheduled field shift, for which they will be paid.  (SUMF ¶ 427.) Plaintiffs do not allege (and there is no evidence to suggest) that any "off-the-clock" work resulted from regularly-scheduled overtime or non-overtime hours.

Significantly, approximately 300 Lieutenants and 60 Captains exercise supervisory authority over Plaintiffs' work days and compensation.  (SUMF ¶ 428.)  To the extent Plaintiffs are not paid overtime due, those decisions are made in a decentralized, supervisor-by-supervisor fashion, and accordingly, certification of Plaintiffs' class is not proper.

See, e.g., Ray v. Motel 6, 1996 U.S. Dist. LEXIS at *11. Moreover, where employees are subject to different supervisors vested with discretion, the claim that Defendants utilized a uniform time-keeping system – even though Plaintiffs have not, and cannot, allege that time-keeping was uniform throughout all work locations – is insufficient to establish that Plaintiffs were subject to a common policy or plan. See King v. CVS/Caremark Corp., Case No. 07-21824-CIV-GRAHAM/TORRES, p. 7 (S.D. Fla. Sept. 10, 2008) ("[A]ny inquiry into claims of unpaid wages requires an assessment of the facts beyond the time keeping system. The analysis would necessarily hinge on the procedures and actions of the managers and other supervisory staff at each store that occurred after the employee attempted to clock-in or out at the cash register") (emphasis in original).

In sum, the multiplicity of individualized circumstances applicable to Plaintiffs weighs against a finding that they were subject to a single decision or common plan. Indeed, assuming Plaintiffs were the victims of FLSA violations, those violations are entirely dependent on all of the individualized characteristics of their employment discussed above, i.e., what their job duties were, where they were assigned, what types of off-the-clock work they had the opportunity to perform, who their supervisor was, and what his or her practices were with respect to the recording of overtime, etc. See Smith, 2007 U.S. Dist. LEXIS at *17.

## C.   DEFENDANTS' DEFENSES ARE INDIVIDUAL TO EACH PLAINTIFF AND INVOLVE AN EXAMINATION OF THE PARTICULAR CIRCUMSTANCES OF HIS OR HER CLAIMS.

The second factor to be analyzed in determining whether Plaintiffs are similarly situated – whether the defenses available to the defendant are individual to each plaintiff – looks at the feasibility of the application of Defendants' defenses "across the board to plaintiffs' claims … or whether many and perhaps disparate defenses could be raised." Duncan v. Phoenix Supported Living, Inc., No. 2:05cv1, 2007 U.S. Dist. LEXIS 24649 (W.D. N.C. March 30,

2007).  Where defenses cannot be applied "across the board," decertification is proper.  Id. at *6-7; see also Proctor, 2008 U.S. Dist. LEXIS at *15-16 ("[D]ifferences in the Plaintiffs' claims mean that the Defendant's defenses would also vary.  Defenses to [the claims of Plaintiffs who testified that they did not work off the clock, but were still not paid correctly] will be distinct from the Plaintiffs alleging they were asked to work off the clock by management").  In this case, it is beyond contravention that the myriad defenses available to Defendants are particular to each disparate Plaintiff, and that application of those defenses will entail an inquiry with respect to each individual.

Defendants' defenses raise many inquiries particular to each Plaintiff.  For example, one of Plaintiffs' overtime claims involves the pre-shift checking of equipment on their assigned ambulances prior to the start of their shifts.  (See Point II.C, supra.)  However, Defendants take the position that with respect to all Plaintiffs assigned to Tours 1 and 3, and with respect to all Plaintiffs assigned to Tour 2 whose vehicles ran on Tour 1, Plaintiffs lacked the opportunity to check their ambulances pre-shift because their vehicles were in the field with the previous crew until just before, or even after, the start of their shift.  (See Point II.C, supra.)  The assertion of this defense, consequently, would involve an analysis of (1) which station(s) each Plaintiff was assigned to during the relevant period of time; (2) which shift(s) each Plaintiff worked during the relevant period of time, (3) which vehicle(s) each Plaintiff was assigned to during the relevant period of time, (4) whether each vehicle to which each Plaintiff was assigned was scheduled to run on the previous tour, and (5) whether each vehicle to which each Plaintiff was assigned ended its activity on the previous tour in time to return to that station so that the Plaintiff in question could check its equipment prior to the start of his or her shift on each day for which each Plaintiff claimed he or she was owed overtime.

Further, as discussed above, whether Defendants are liable for failing to capture overtime earned, or for "rounding" overtime, involves an examination of how overtime was recorded or authorized by each Plaintiff's supervisor, according to each Plaintiff's testimony, and whether that process violated the FLSA as a matter of law.  (See Point VI.B.2(5), *supra*.)  By the same token, whether Defendants are liable for late overtime payments is a highly individualized inquiry involving an analysis of the reasons for each late payment, whether and when each Plaintiff reported his or her failure to receive the overtime, and when the FDNY issued payment to each Plaintiff.  (SUMF ¶¶ 364-67.)

Further still, Defendants' defenses include individualized inquiries as to whether some or all of Plaintiffs' claims for overtime are *de minimis*, which involves Plaintiff-by-Plaintiff analysis of how much time each Plaintiff spent on off-the-clock work each day, and how frequently such work could have occurred.  (See Point II.B and C, *supra*.)

Finally, Defendants' arguments with respect to the offsetting of Plaintiffs' damages (see Point V, *supra*) are highly individualized to each Plaintiff.  With respect to *each* Plaintiff, for *each* week, the analysis involves, but is not necessarily limited to, the following: (1) the total number of regular hours, cash overtime hours, and comp time overtime hours worked, (2) the number of hours worked on night shift, (3) the pay rate used by Defendants to pay overtime and the pay rate that reflects night shift differential, (4) whether or not Meal Money was received and the total amount of Meal Money received, (5) the amount, if any, of overtime payment not received within two pay periods, and (6) the total amount of overtime pay received by each Test Plaintiff both in cash and in time.  (SUMF ¶ 429.)  Further, for Plaintiffs assigned to EMD, another level of analysis as to what extent their paid breaks offset any damages would be required.  (SUMF ¶ 430.)

**D.**   **FAIRNESS AND PROCEDURAL CONCERNS WEIGH IN FAVOR OF DECERTIFICATION.**

In examining whether fairness and procedural considerations merit a finding that plaintiffs are similarly situated, courts look to whether trying the case as a collection action would (1) lower costs to plaintiffs, because of the "pooling of resources," and (2) "limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same controversy." Duncan, 2007 U.S. Dist. LEXIS at *8-9, citing Hoffman-La Roche, Inc. v. Sperling, 493 U.S. 165, 170, 110 S. Ct. 482, 107 L. Ed. 2d 480 (1989). Where a collective proceeding has the potential to lower costs for plaintiffs, but lacks the potential to resolve common issues of fact and law, however, decertification is proper. See id. at *9. In Duncan, the Court found that because each plaintiff must testify at trial with respect to his or her particular experiences, "defendants could be potentially prejudiced by a jury painting with a broad brush." Id. This potential for prejudice outweighed any consideration of the reduction in cost. See id. at *10. In addition, "the availability of defenses to some but not all of the putative class Plaintiffs 'clearly poses significant case management concerns.'" Anderson v. Cagle's, Inc., 488 F.3d 945, 954 (11th Cir. June 11, 2007), quoting In re School Asbestos Litigation, 789 F.2d 996, 1011 (3d Cir. 1986) ("When, and if, the district court is convinced that the litigation cannot be managed, decertification is proper").

As detailed above, the multiplicity of factual circumstances particular to each Plaintiff would mandate 1,473 separate inquiries into the specifics of those individual circumstances, and applicability of any number of Defendants' defenses. These separate inquiries would essentially be "mini-trials" with respect to each Plaintiff, and as such, proceeding as a collective action is not appropriate. See Reyes v. Texas EZPawn, L.P., No. V-03-128, 2007 U.S. Dist. LEXIS 1461, *29 (S.D. Tx. January 8, 2007) ("In light of the individual

analysis each Plaintiff's claim will require, the judicial inefficiency of having essentially forty plus mini-trials clearly outweighs any potential benefits in proceeding as a collective action. The Plaintiffs' claims are not amenable to generalized evidence and the Court would not be able to coherently manage the class without potentially prejudicing the parties") (internal quotations and citations omitted).

**POINT VII**

**TO THE EXTENT DEFENDANTS ARE DEEMED TO
HAVE VIOLATED THE FLSA, SUCH VIOLATIONS ARE
NOT WILLFUL.**

Pursuant to 29 USC § 255(a) of the FLSA, any action for unpaid overtime must be commenced within two years after the cause of action accrued unless that cause of action arises out of an employer's willful violation. 29 U.S.C. § 255(a). The U.S. Supreme Court has held that a willful violation of the FLSA occurs only when "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988). An action is not willful if the employer does not act recklessly in determining its legal obligations. Id. at 135. Willfulness is not established by "nothing more than negligence, or, perhaps, on a completely good-faith but incorrect assumption that a pay plan complied with the FLSA in all respects." Id.

Courts in the Second Circuit have consistently found willfulness lacking where the defendant's conduct did not meet the high threshold established in McLaughlin. For instance, even where an employer failed to take sufficient steps to ensure absolute compliance with the FLSA, as long as the employer made an effort to determine whether employees are being paid properly, courts have held that such a violation does not rise to the level of willfulness. See e.g., Bowrin v. Catholic Guardian Soc., 417 F. Supp. 2d 449, 475-76 (S.D.N.Y. 2006) (finding that a three-year statute of limitations was inappropriate because there was no

86

evidence that the defendant "*knew* it was violating the FLSA"); DeBejian v. Atlantic Testing Lab., Ltd., 64 F. Supp. 2d 85, 92 (N.D.N.Y. 1999) (holding that the employer did not act willfully because it made an effort to ascertain compliance):

As a matter of law, Plaintiffs fall far short of meeting their burden of proving that the FDNY showed reckless disregard for the FLSA and its overtime requirements. Ever since applicability of the FLSA to municipal entities in 1986, the City has endeavored to comply with the statute.[55] (See Point V.B.1, *supra*.) Plaintiffs cannot point to any evidence that the FDNY knew of any violations of the FLSA. In the absence of any notification that its practices were unlawful, and in the face of its many efforts to comply with the FLSA, Defendants' actions cannot be considered willful. As a result, a two-year statute of limitations applies to Plaintiff's claims, and bars a great many of them, and further, Plaintiffs are not entitled to liquidated damages.

## POINT VIII

### THE CLAIMS OF AT LEAST 29 PLAINTIFFS MUST BE DISMISSED IN THEIR ENTIRETY BECAUSE THEY FILED FOR BANKRUPTCY, DID NOT LIST THIS ACTION ON THEIR PETITIONS, AND THEREFORE LACK STANDING OR ARE JUDICIALLY ESTOPPED.

**A.   LEGAL STANDARD.**

Commencement of a bankruptcy proceeding creates a bankruptcy estate. See 11 U.S.C. § 541(a). It is well-settled that all pre-petition causes of action belonging to a debtor pass by operation of law to the bankruptcy estate under 11 U.S.C. § 541. See Ayazi v. New York City Bd. of Educ., No. 98-CV-7461 (NGG) (CLP), 2006 U.S. Dist. LEXIS 48003 at *8-9 (S.D.N.Y. July 14, 2006) citing Seward v. Devine, 888 F.2d 957 (2d Cir. 1989); see also

---

[55]   Plaintiffs are not entitled to liquidated damages as a matter of law on this same basis. See Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 142 (2d Cir. 1999) (No liquidated damages where defendant took "active steps to ascertain the dictates of the FLSA and then acted to comply with them").

Bromley v. Fleet Bank, 240 A.D.2d 611 (2d Dep't 1997); Barger v. City of Cartersville, 348
F.3d 1289, 1292 (11th Cir. 2003) ("Property of [the] bankruptcy estate includes all potential
causes of action that exist at the time petitioner files for bankruptcy"), citing 11 U.S.C. § 541(a));
Kunica v. St. Jean Financial, Inc., 233 B.R. 46, 52 (S.D.N.Y. 1999) ("A basic tenet of
bankruptcy law is that all assets of the debtor, including all pre-petition causes of action
belonging to the debtor, are assets of the bankruptcy estate that must be scheduled for the benefit
of creditors").  Accordingly, "[a] debtor seeking shelter under the bankruptcy laws must disclose
all assets, or potential assets, to the bankruptcy court." Burnes v. Pemco Aeroplex, Inc., 291
F.3d 1282, 1286 (11th Cir. 2002), citing 11 U.S.C. § 521(1)).  Furthermore, "[f]ailure to list an
interest on a bankruptcy schedule leaves that interest in the bankruptcy estate." See, e.g., Parker
v. Wendy's International, Inc., 365 F.3d 1268, 1272 (11th Cir. 2004); Vreugdenhill v. Navistar
Int'l Transp. Corp., 950 F.2d 524, 525-26 (8th Cir. 1991).

        Should a debtor fail to list a pending lawsuit on his or her bankruptcy petition, and
that cause of action, consequently, becomes part of the bankruptcy estate, "all rights held by the
debtor in the asset are extinguished[.]" Parker, 365 F.3d at 1272, citing 11 U.S.C. § 554(a)-(c)).
In addition to loss of any such rights, the debtor lacks standing to prosecute a claim.  Instead, the
trustee, as the representative of the bankruptcy estate, "[i]s the real party in interest with
exclusive standing to assert claims which are property of the bankruptcy estate." Barger, 348
F.3d at 1292, citing Wieburg v. GTE Southwest Incorporated, 272 F.3d 302, 306 (5th Cir. 2001).
Accordingly, in such a situation, plaintiff has neither a claim nor standing to sue. See Ayazi,
2006 U.S. Dist. LEXIS at *7 ("[W]ith respect to a cause of action that was included in the
bankruptcy estate, the debtor lacks standing to pursue that cause of action once the bankruptcy
estate closes"), citing Roshenshein v. Kleban, 918 F. Supp. 98 (S.D.N.Y. 1996).  It is well-

established that "if the plaintiff loses standing at any time during the pendency of the proceedings in the district court or in the appellate courts, the matter becomes moot, and the court loses jurisdiction." Id. at *7, quoting Altman v. Bedford Central School Dist., 245 F.3d 49, 69 (2d Cir. 2001). Even where a debtor proceeds *pro se*, unscheduled assets are not deemed abandoned by the trustee (and remain property of the bankruptcy estate). Ayazi, 2006 U.S. Dist. LEXIS 48003 at *25-28.

In addition to the lack of standing and transfer of a claim to the bankruptcy estate, a plaintiff who fails to schedule pending claims on a bankruptcy petition is estopped from pursuing those claims because he or she has taken a contrary position before another court. See, e.g., EEOC v. Outback Steak House of Fla., Inc., No. 06-CV-01935-EWN-BNB, 2007 U.S. Dist. LEXIS 62996 (D. Col. Aug. 27, 2007). For the doctrine of judicial estoppel to apply: (1) the party to be estopped must have taken two positions that are clearly inconsistent; and (2) the prior inconsistent position must have been adopted by the court in some manner. See Kunica, supra, 233 B.R. 46, 29. Judicial estoppel exists to "'prevent the party from playing fast and loose with the courts, and to protect the essential integrity of the judicial process.'" Rosenshein, 918 F. Supp. at 104, citing In Re Galerie de Monnaies of Geneva, Ltd., 62 Bankr. 224, 226 (S.D.N.Y. 1986).While the bankruptcy trustee may be entitled to intervene in the pending litigation and pursue plaintiff's claims, Graupner v. Town of Brookfield, 450 F. Supp. 2d 119, 129 (D. Mass. 2006), many courts have held that plaintiff-debtor's estoppel prevents a recovery greater than that owed to the bankruptcy creditors. Outback, 2007 U.S. Dist LEXIS at *24 quoting Parker, 265 F.2d at 1272.

Multiple courts have confirmed that plaintiffs who fail to schedule their pending claims as assets forfeit an FLSA claim. See Moore v. Fred's Stores of Tenn., Inc., No. 4:05-CV-

133 (CDL), 2006 U.S. Dist. LEXIS 57494 (M.D. Ga. Aug. 16, 2006); Moreno v. Autozone, Inc.,

No. C05-04432 (MJJ), 2007 U.S. Dist. LEXIS 29432 (N.D. Cal. Apr. 6, 2007).

**B.    THOSE PLAINTIFFS WHO FILED FOR BANKRUPTCY AND FAILED TO LIST THIS ACTION ON THEIR STATEMENTS OF FINANCIAL AFFAIRS LACK STANDING TO PURSUE THEIR CLAIMS.**

In this case, at least 29 Plaintiffs' bankruptcy cases in the Southern District of

New York or the Eastern District of New York have been discharged since they opted into this

litigation.[56] (SUMF ¶ 431.) Those individuals, the dates on which they filed for bankruptcy, and

the dated on which their bankruptcy actions were discharged are as follows:

| NO. | NAME | DATE OF FILING | DATE OF DISCHARGE |
|-----|------|----------------|-------------------|
| 1.  | Kevin M. Allen (SUMF ¶ 432.) | 3/27/2008 | 7/2/2008 |
| 2.  | Jennifer P. Barton (SUMF ¶ 433.) | 5/13/2005 | 9/21/2005 |
| 3.  | Leonardo Bedoya (SUMF ¶ 434.) | 6/15/2005 | 1/10/2006 |
| 4.  | Janet Ann Berg (SUMF ¶ 435.) | 5/18/2005 | 9/7/2005 |
| 5.  | Lawrence G. Biggs (SUMF ¶ 436.) | 8/3/2005 | 5/5/2006 |
| 6.  | Lynette Colbert (SUMF ¶ 437.) | 8/20/2007 | 1/18/2008 |
| 7.  | Steven T. Conboy (SUMF ¶ 438.) | 5/26/2005 | 12/01/2005 |
| 8.  | Michelle O. Daniel (SUMF ¶ 439.) | 5/25/2006 | 11/29/2006 |
| 9.  | Leo J. DeRaimo (SUMF ¶ 440.) | 10/8/2005 | 4/25/2006 |
| 10. | Ronald Diaz (SUMF ¶ 441.) | 2/25/2008 | 8/28/2008 |
| 11. | Annette Esposito (SUMF ¶ 442.) | 9/10/2004 | 1/4/2005 |
| 12. | Bernard W. Graddick (SUMF ¶ 443.) | 8/16/2004 | 10/2/2006 |

---

[56]    For purposes of judicial estoppel and lack of standing, Defendants focused upon Plaintiffs whose bankruptcy petitions have been closed pursuant to an Order of Discharge and/or Order of Final Decree. Many more Plaintiffs have open bankruptcy actions pending, and have failed to list this action as an asset on their petitions.

| 13. | Steven Graulau (SUMF ¶ 444.) | 5/5/2006 | 8/02/2006 |
| 14. | Glenroy Griffith (SUMF ¶ 445.) | 9/29/2005 | 5/22/2006 |
| 15. | Magda Gross (SUMF ¶ 446.) | 6/4/2008 | 9/11/2008 |
| 16. | Alan B. Guss (SUMF ¶ 447.) | 9/30/2005 | 3/27/2006 |
| 17. | Charles D. Harris (SUMF ¶ 448.) | 4/3/2008 | 7/8/2008 |
| 18. | Michael J. Kenna (SUMF ¶ 449.) | 10/13/2005 | 2/8/2006 |
| 19. | Reynaldo LaRuy (SUMF ¶ 450.) | 7/13/2005 | 6/8/2006 |
| 20. | Vivian Lomacang (SUMF ¶ 451.) | 10/13/2005 | 10/30/2006 |
| 21. | Brandon Mahon (SUMF ¶ 452.) | 2/27/2007 | 5/30/2007 |
| 22. | Ronald Mainor (SUMF ¶ 453.) | 4/15/2005 | 8/8/2005 |
| 23. | Wanda Montalvo (SUMF ¶ 454.) | 3/8/2005 | 7/22/2005 |
| 24. | Henry Morales (SUMF ¶ 455.) | 10/16/2005 | 3/16/2006 |
| 25. | Shawn N. Narcisse (SUMF ¶ 456.) | 10/27/2004 | 8/1/2005 |
| 26. | Celestine Richardson (SUMF ¶ 457.) | 1/26/2004 | 3/9/2005 |
| 27. | Johnny Rivera (SUMF ¶ 458.) | 8/1/2005 | 11/28/2005 |
| 28. | Arnold Silva (SUMF ¶ 459.) | 10/16/2006 | 10/24/2007 |
| 29. | Regina Watts (SUMF ¶ 460.) | 11/29/2004 | 3/17/2005 |

The "Statement of Financial Affairs" document accompanying all bankruptcy petitions in the Southern and Eastern Districts requires the debtor to "[l]ist all suits and administrative proceedings to which the debtor is or was a party within one year immediately preceding the filing of this bankruptcy case." (SUMF ¶ 461.) In addition, a bankruptcy petitioner is under the continuing duty to disclose any new claims that may arise during the course of bankruptcy

proceedings. See Hamilton v. State Farm Fire & Casualty Co., 270 F.3d 778, 785 (9th Cir. 2001) ("The debtor's duty to disclose potential claims as assets does not end when the debtor files schedules, but instead continues for the duration of the bankruptcy proceeding"); Browning Mfg. v. Mims (In re Coastal Plains, Inc.), 179 F.3d 197, 208 (5th Cir. 1999) ("The duty of disclosure in a bankruptcy proceeding is a continuing one, and a debtor is required to disclose all potential causes of action"); Fed. R. Bankr. § 1009 (Bankruptcy disclosures may be amended as a matter of course). Failure to amend a bankruptcy petition to include newly discovered claims bars the plaintiff from pursuing such omitted claims. See Jethroe v. Omnova Solutions, Inc., 412 F.3d 598, 600 (5th Cir. 2005) (Plaintiff judicially estopped from pursuing an EEOC charge filed while his bankruptcy petition was pending and where he did not amend petition to include the claim). Yet, *none* of the Plaintiffs above listed this lawsuit as an asset in their Statements, or subsequently amended their Statements to include it. (SUMF ¶ 462.)

Accordingly, Plaintiffs above lost standing to pursue this lawsuit when they filed for bankruptcy. Their claims became the property of the bankruptcy estates. Only the trustees for the bankruptcy estates, as the real parties in interest, have standing to pursue them.

## C.   PLAINTIFFS WHO FILED FOR BANKRUPTCY AND FAILED TO LIST THIS ACTION ON THEIR STATEMENTS OF FINANCIAL AFFAIRS SHOULD BE JUDICIALLY ESTOPPED FROM PURSUING THEIR CLAIMS.

### 1.   Plaintiffs Have Clearly Inconsistent Positions in their Prior Bankruptcy Proceedings and In the Instant Matter.

The 29 Plaintiffs listed above have clearly asserted inconsistent positions in the actions they have commenced. On the one hand, Plaintiffs instituted the instant action in January 2005 alleging wrongdoing by Defendants in connection with the payment of wages. Conversely, Plaintiffs concealed the existence of this action and any known claims when completing their respective bankruptcy Statement of Financial Affairs, in which they "declare[d] under penalty of

perjury that [they had] read the answers contained in the foregoing statement of financial affairs and any attachments thereto and they are true and accurate." (SUMF ¶ 463.)   The contradictory representations made by Plaintiffs cannot be reconciled.  Accordingly, the first prong for judicial estoppel is satisfied.

2.       **Plaintiffs' Inconsistent Positions were Adopted by the Bankruptcy Court.**

Moreover, Plaintiffs' inconsistent positions were adopted by the bankruptcy court because reorganization plans were approved and their debts were discharged pursuant to such plans.  "When an assertion in a bankruptcy proceeding is at issue, the … requirement [that that prior inconsistent position must have been adopted by the court in some manner] is usually fulfilled when the bankruptcy court confirms a plan pursuant to which creditors release their claims against the debtor."  Negron v. Weiss, No. 06-CV-1288, 2006 U.S. Dist LEXIS 69906 at *9 (E.D.N.Y. Sept. 27, 2006).  Additionally, the second prong is satisfied when the party against whom the estoppel is claimed "obtained a judgment as a result of the inconsistent position." Village of Canon v. Bankers Trust Co., No. 95 Civ. 3706 (JGK), 1997 U.S. Dist LEXIS 1112 at *9 (S.D.N.Y. Feb. 3, 1997).

Accordingly, Plaintiffs should not be permitted to squander judicial resources and mislead their creditors by denying the existence of any potential claims against Defendants while simultaneously pursuing litigation and a substantial monetary recovery from Defendants.

## **CONCLUSION**

For the reasons herein stated, Defendants the City of New York and the Fire Department of the City of New York respectfully request that their motion for summary judgment be granted.  To the extent that any elements of Plaintiffs' claims are not dismissed, decertification should be directed.


Respectfully submitted,

JACKSON LEWIS LLP
    59 Maiden Lane
    New York, New York 10038-4502
    (212) 545-4000

Dated: September 23, 2008             By: _Felice M Ekelman_____
      New York, New York                      Felice B. Ekelman (FE 5692)
                                       Samantha Abeysekera (SA 8198)

## CERTIFICATE OF SERVICE

I hereby certify that on September 23, 2008, I caused true and correct copies of the following documents to be served in accordance with the Federal Rules of Civil Procedure, and/or the Southern District's Local Rules on Electronic Service upon Plaintiffs, through their counsel of record, by operation of the Court's electronic filing system: (1) Defendants' Notice of Motion for Summary Judgment and/or Decertification; (2) Defendants' Memorandum of Law in Support of Defendants' Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 and/or for Decertification Pursuant to 29 U.S.C. § 216(b); (3) Affidavit of Chief Jerry Z. Gombo in Support of Defendants' Motion for Summary Judgment and/or Decertification, with accompanying Exhibits; (4) Affidavit of Christopher Erath, Ph.D. in Support of Defendants' Motion for Summary Judgment and/or Decertification, with accompanying Exhibits; (5) Affidavit of Pat Slesarchik in Support of Defendants' Motion for Summary Judgment and/or Decertification, with accompanying Exhibits; and (6) Defendants' Rule 56.1 Statement of Undisputed Material Facts.

In addition, I hereby certify that I caused a true and correct copy of the Affidavit of Felice B. Ekelman, Esq. in Support of Defendants' Motion for Summary Judgment and/or Decertification, with accompanying Exhibits, to be served upon Plaintiffs through their counsel of record at the following address, via Fed Ex overnight delivery:

> GREGORY K. McGILLIVARY, ESQ.
> WOODLEY & McGILLIVARY
> 1125 15th Street, N.W., Suite 400
> Washington, DC 20005

_SAbeysekera_
Samantha Abeysekera

95